HUBBARD & GRAY v. F. W. PETTEY.

Decided December 16, 1904.

**Contract to Loan Money—Payment by Check—Insolvent Bank.**

Defendant agreed to loan plaintiffs a sum of money on their note and in pursuance thereof gave his check on a private bank, the owner of which, being indebted to him, had agreed to honor it and receive credit on his indebtedness. Plaintiffs presented the check and asked that it be placed to their credit, which was done. The bank was insolvent at the time and closed its doors two days afterwards, but the banker testified that he had sufficient funds of his own on hand to pay the check and would have done so if requested. Held, that plaintiffs became depositors with the bank to the amount of the check and defendant complied with his contract to loan the money.

Appeal from the District Court of Rusk. Tried below before Hon. Richard B. Levy.

*J. R. Arnold* and *J. H. Turner,* for appellants.

*Gould & Morris,* for appellee.

PLEASANTS, ASSOCIATE JUSTICE.—This suit was brought by appellants against the appellee. As cause of action plaintiffs' petition alleges in substance that about the 1st of December, 1902, appellee agreed to advance them $1,200 on or about January 1, 1903, provided they would execute and deliver to him their note for that amount with good security and bearing interest at the rate of 10 percent per annum; that they complied with their agreement and executed and delivered to appellee on January 1, 1903, their note for the sum above stated with

security satisfactory to appellee; that appellee accepted and still holds said note but has failed and refused to pay to them the sum of $1,200 therefor, as he had agreed and promised to do. The prayer of the petition is for the recovery of $1,200 with interest at 10 percent from January 1, 1903, or in the alternative for the cancellation of said note.

Appellee answered by general denial and by special plea, in which it is averred that he paid the appellants on January 2, 1903, the $1,200 for which the note above mentioned was executed.

The case was tried before a jury in the court below, and under peremptory instructions from the court a verdict was returned in favor of the defendant and judgment was rendered in accordance therewith.

We deduce from the record the following facts: In December, 1902, appellee agreed with appellants that on or about January 1, 1903, he would take up and hold for them vendor's lien notes to the amount of $2,000 due by them upon a gin and mill plant which they had purchased from A. L. Clark, and would advance them the further sum of $1,200 with which to purchase additional machinery for said gin, provided appellants would execute and deliver to him their note for that amount with good security and bearing 10 percent interest.

At the time this agreement was made A. Wettermark owed appellee a note for $7,000, which he had notified appellee he desired to pay. Wettermark was a banker doing business under the firm name and style of A. Wettermark & Co., and being the sole owner of said banking business. Before making the agreement with appellants appellee saw Wettermark, and it was agreed between them that when appellee made the loan to appellants, which it was then understood would be about January 1, 1903, he could check on the bank of A. Wettermark & Co. for the amount, and his checks would be paid and the amount would be afterwards credited on the note of Wettermark in his favor. The Clark note was taken up by Pettey on January 1st, by draft drawn on A. Wettermark & Co., which was paid when presented. The $1,200 note was delivered to Pettey on January 1st, and on the next day E. W. Hubbard, one of the appellants, went to Pettey's office to get the money. Pettey gave him a check for the $1,200 on A. Wettermark & Co., which he took to the bank and had placed to the credit of Hubbard & Gray. This was on Friday. On the following Monday Wettermark was forced into bankruptcy and the bank was closed before Hubbard & Gray had drawn the $1,200. The details of the transaction are thus stated by Mr. Hubbard:

"When I went into his office for the money he, Pettey, just sat down and wrote out a check and handed it to me without saying anything about a check or money either. I think I told Mr. Gray that I had better come to town and get that money from Mr. Pettey, and I came on up here and got that check. I took the check to Mr. Wettermark's bank, and Mr. Wettermark himself was at the window, and I handed him the check and told him to deposit it to the credit of Hubbard & Gray, and he then took the check and canceled it, and gave me what I call a 'deposit slip.' He had written on the deposit slip right opposite the word 'checks,' in figures, $1,200, and turned it over to me.

"At the time he gave me the check for $1,200 he also gave me a

check for $275 on the same bank. At the time we made the trade with
Mr. Clark for the gin plant I put in a pair of mules for $275, and I
told Mr. Gray that if I put in the mules I would want money for them,
and when Mr. Clark took his note to Mr. Pettey he (Mr. Pettey) paid
him the $2,000 less the $275 for the mules, and when he gave me the
check for the $1,200 he gave me a separate check for the $275 for the
mules. I took both checks over to Wettermark's bank at the same time,
and I handed him the $1,200 one first, and he gave me a deposit slip for
it, and then I handed him the other check and told him I wanted $75
of it in money, and to place the balance to my credit. He wrote on
another slip '$200' and counted out the $75 to me in cash.

"We were going to use the $1,200 that we were to get from Dr.
Pettey to buy the boiler and engine to run the gin plant with. We ex-
pected to pay for them the next Wednesday. I won't be positive that
I knew when the engine and boiler would be here when I deposited the
check for $1,200 in the bank. My idea in depositing the check and
leaving the money in the bank was because I did not want to take it
out home, and I wanted to leave it there so that when the engine and
boiler came I could take the money out and pay for them. At the time
the check for the $1,200 was signed by Dr. Pettey, the First National
Bank of Henderson was doing business here, and I suppose there was a
pretty good competition between it and Wettermark's bank, but I do not
know. Dr. Pettey told me that he was a friend of Mr. Wettermark's
and I was satisfied that he was, and I regarded Dr. Pettey as. one of
my best friends.

'I do not know whether Mr. Wettermark would have refused to pay
those checks or not. I never asked him for the money except for that
$75. I just put down the $1,200 check and asked him to give me credit
for it—to give Hubbard & Gray credit for it. He didn't refuse to pay
it. He didn't refuse to pay the $275 check. He paid what I asked
for."

When Pettey told Wettermark that he wanted this money to loan
to appellants, Wettermark asked him if he thought Hubbard & Gray
would use the money at once, and stated that he would like to get their
business and keep the money for them until they needed it. At the
time Pettey gave the check to Hubbard he told him that Wettermark
was an old friend of his, and if he was not going to use the money at
once he would be glad for him to deposit it with Wettermark. When
this check was drawn Wettermark was in fact insolvent, but Pettey had
no idea that such was the fact.

Wettermark testified that all money deposited with him on the 2d
and 3d of January was kept separate from other funds in the bank and
was returned to the depositors when he was forced into bankruptcy.
He kept these deposits separate because he knew he was insolvent when
they were made. When Hubbard presented the $1,200 check Wetter-
mark had several thousand dollars of his own in the bank and would
have given Hubbard the money on the check if he had not requested
him to credit the amount to the firm of Hubbard & Gray. After Hub-
bard made this request the amount of the check was charged to Pettey
and credited to Hubbard & Gray. These entries were made on the

blotter but were not transcribed to the ledger until the trustee in bankruptcy took charge of the business. When the bank closed business on Saturday evening, the 3d of January, it had on hand between four and five thousand dollars in cash, which did not include any deposits made on the 2d and 3d of January after Wettermark became aware of his insolvency. After Hubbard had left the check with Wettermark with instructions to credit the amount to appellant firm he returned to Pettey and told him he had left the money on deposit with Wettermark. When Wettermark failed he owed Pettey on the $7,000 note, after deducting the amount of the checks drawn on him on January 1st and 2d, a balance of $4,346. Pettey had been a depositor of Wettermark's bank for a number of years, and in addition to the amount due him by Wettermark on the note he had on deposit in the bank at the time he drew the checks on January 2d between $1,300 and $1,500.

Upon these facts, which are undisputed, the trial court did not err in instructing the jury to return a verdict for the defendant.

Appellants did not accept the check as payment of the $1,200, but when they presented the check to Wettermark, who had the money with which to pay it, and requested him to place the amount to their credit, which was done, Pettey was released from further liability thereon and appellants became the creditors of the bank. It is immaterial that Pettey did not have the amount of money necessary to pay the check deposited to his credit on the books of the bank at the time it was drawn. The bank owed him the money and had the amount on hand with which to pay the check, and had agreed to pay it before it was drawn. Under these facts he is in the same position as he would be if he had had the money placed to his credit on the books of the bank. Haskins v. Dougherty, 29 Texas Civ. App., 313, 69 S. W. Rep., 103.

We do not think the evidence raises the issue of fraud on the part of appellee. The evidence shows that he had no knowledge of Wettermark's financial condition when he gave the check and suggested to appellants that they leave the money with the bank until they needed it.

No useful purpose would be served by a discussion of the various assignments of error in detail, and we deem it sufficient to say that we have considered each of the assignments, and in view of the undisputed evidence above set out in our opinion none of them should be sustained.

The judgment of the court below is affirmed.

*Affirmed.*